IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MANDISA B.,[1]

       Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

Case No. 3:24-cv-00093-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

    Plaintiff Mandisa B. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND

Born in February 1985, plaintiff alleges disability beginning December 15, 2018, due to sarcoidosis, fibromyalgia, and "post partum stress." Tr. 338, 342. Her application was denied initially and upon reconsideration. On December 9, 2022, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was unrepresented[2] and testified, as did her brother and a vocational expert. Tr. 43-85. On April 4, 2023, the ALJ issued a decision finding plaintiff not disabled. Tr. 21-37. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found that plaintiff engaged in substantial gainful activity from the alleged onset date throughout 2019. Tr. 24. Yet she did not engage in substantial gainful activity thereafter, "thus the remainder of [the ALJ's] decision address[ed] the period since January 1, 2020." *Id.* At step two, the ALJ determined the following impairments were medically determinable and severe: "right knee degenerative joint disease, fibromyalgia, obesity, depression, and anxiety." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 25.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff

---

[2] At the hearing, the ALJ explicitly acknowledged plaintiff's lack of "represent[ation] by an attorney or non-attorney representative" and asked whether she would "like a one-time postponement for more time to get a representative?" Tr. 45-46. Plaintiff responded, "I've had representatives so many times" – referring to her prior disability applications and denials – and then expressly waived her right to representation. Tr. 46.

Page 2 – OPINION AND ORDER

had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except:

> [S]he can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can tolerate occasional exposure to extreme cold, extreme heat, and atmospheric conditions such as fumes, odors, dust, gases, and poor ventilation. She can tolerate no exposure to hazards such as unprotected heights and moving mechanical machinery. She can understand, remember, and carry out simple and detailed tasks that can be learned in 30 days or less. She can never perform detailed tasks that require more than 30 days to learn. She can never perform work requiring a specific production rate, such as assembly line work. She can tolerate occasional changes in a routine work setting. She can tolerate occasional interaction with the general public, coworkers, and supervisors.

Tr. 28.

At step four, the ALJ determined plaintiff was capable of performing her past relevant work as a housekeeper. Tr. 35. Alternatively, the ALJ concluded at step five there were a significant number of jobs in the national economy plaintiff could perform despite her impairments, such as hand packager-inspector, price marker, and laundry sorter. Tr. 36.

## DISCUSSION

Plaintiff argues the ALJ erred by failing to account for all of her limitations in the RFC. In particular, plaintiff contends "light exertional work requires extensive standing and walking, including up to six hours of an eight-hour day, which is inconsistent with [her] pronounced degenerative joint disease of the knee." Pl.'s Opening Br. 5 (doc. 10). Plaintiff's argument is based on the chart note of orthopedic surgeon Bryce Bederka, M.D., and the fact that "the agency physicians reached the medium RFC determination without the opportunity to examine [that] medical evidence." *Id.* at 7-13.

The RFC is the most a person can do, despite their physical or mental impairments. *See* 20 C.F.R. § 404.1545. In formulating an RFC, the ALJ must consider all the claimant's medically

Page 3 – OPINION AND ORDER

determinable impairments, including those that are not "severe," and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. *Id.*; *see also* SSR 96-8p, *available at* 1996 WL 374184. The ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

In this case, the ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 29. That is, although plaintiff "does have some ongoing limitations due to her right knee degenerative joint disease, fibromyalgia, obesity, depression, and anxiety, they do not cause more restrictions than the residual functional capacity." *Id.*

The ALJ specifically addressed plaintiff's physical pain issues – i.e., her "fibromyalgia and right knee degenerative joint disease" – as follows:

> Records by Charles Goldberg, MD from 2018, 2019, and 2020 consistently show that while the claimant alleged fatigue, weakness, and extensive body and joint pain, she also asserted that she "works through it" and her examination indicated that despite some tenderness, guarded gait, and restricted range of motion that caused generally mild to moderate distress, she was well kempt, engaging, and demonstrated normal motor strength, normal muscle tone, intact cranial nerves, symmetrical reflexes, and no tremor or other coordination problems. Dr. Goldberg prescribed the claimant Oxycodone and Gabapentin to manage her chronic pain and fibromyalgia symptoms, also noting that the claimant was "coping" with her pain levels and would likely see some further improvement with the muscle relaxation afforded by her Alprazolam prescription for depression.
>
> Treatment and examination notes by multiple providers throughout 2022 and 2023 show that despite the claimant's report of chronic body or right knee pains, she consistently appears at well appearing, well groomed, and in no acute distress. Virginia Hovland, FNP specifically indicated in notes from May of 2022 that the claimant was no[t] taking any medication for her pain, she was in no acute distress, and she exhibited normal gait and station.

> The claimant repeatedly endorsed a history of noticeable improvement in her pain with opiates, such as Oxycodone, as well as Gabapentin and muscle relaxers. Records also show that the claimant was prescribed Norco "for years" by a prior provider, which she asserted was "quite effective" and significantly improved her quality of life and overall functioning. Notably, Aubrey Corbett, MD specifically noted in October of 2022 that even with the claimant's history of good compliance with her prior provider's opiate prescription, she was "not comfortable" providing the claimant with a longterm Tramadol prescription. Similarly, providers in 2023 again indicated in their notes that they were not comfortable prescribing controlled substances due to concern for both potential abuse and diversion.
>
> Orthopedic surgery consultation notes by Bryce Bederka, MD from June of 2022, show that the claimant reported that while she has had some longstanding right knee pain issues, she began experienced progressively worse right knee pain over the previous six months or so, further asserting that this worsening knee pain started after she was performing some gardening or yard work. While the claimant presented in a wheelchair and asserted that she uses a walker to ambulate at home, she also stated that she remains "very active" and takes care of her family, further noting that she manages her pain with oxycodone as well as myriad other modalities such as anti-inflammatory, topicals, ice, and a knee massager. Dr. Bederka specifically indicated that while review of plain radiographs of the claimant knee showed advanced medal compartment osteoarthritis, but her description of her pain at the time of the consult was "rather significant" compared to what he observed from those radiographs. The doctor told her that she would need to undergo a MRI scan in order for him to formulate a treatment plan. Upon exam, Dr. Bederka found the claimant was alert, fully oriented, and in no acute distress despite some right knee effusion, and while she did have some tenderness on the lateral and medial joint lines as well as abnormal range of motion, her Varus, Valgus, and Anterior and Posterior Drawer tests were all negative.
>
> Additionally, as noted above, Dr. Lindman highlighted the claimant's history of malingering in her July of 2019 consultative evaluation, and while the doctor does state in her summary that the claimant "appears" to have some physical limitation, she also noted that the claimant appeared at the exam with a walker but was able to walk adequately without it.

Tr. 31-32 (internal citations omitted).

> And regarding the state agency sources, the ALJ resolved, in relevant part:
>
> Norman Staley, MD evaluated the claimant's file for the state agency in November of 2019 and found that she has no severe physical impairments but also stated that the claimant can lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk about six hours total in an eight-hour workday, sit about six hours in an eight-hour workday, frequently climb ramps, stairs, ladders, ropes, and scaffolds, and frequently balance and stoop. The undersigned finds this opinion

> unpersuasive despite being consistent with that of Dr. Stevens, the other state agency evaluator, because neither doctor had access to the complete medical record at the time of their review and the evidence therein, particularly the recent medical records from Blackburn Primary Care and Columbia Medical Clinic as well as the extensive treatment notes by providers with Providence Health and Services, supports the assessment of slightly more restrictive exertional and postural limitations as well as additional restrictions related to avoiding exposure to environmental factors such as extremes of temperature, pulmonary irritants, and hazards.

Tr. 33-34. In other words, the ALJ found the state agency consulting source opinions from 2019 – which essentially limited plaintiff to medium exertion work – unpersuasive in light of more recent medical evidence that was indicative of additional restrictions.

As an initial matter, plaintiff does not cite to a particular piece of evidence that the ALJ allegedly wrongfully rejected. Indeed, as discussed in greater detail below, Dr. Bederka's chart notes do not articulate any concrete functional limitations. And his examination findings and narrative report are not necessarily indicative of a more restrictive RFC. This is significant because it is well-established that an ALJ need "not . . . formally assess, or even discuss" records that do not contain any concrete functional limitations, as they are "not probative as to what kind of work [the claimant can] perform despite [her] impairment." *Corso v. Colvin*, 2014 WL 950029, *10 (D. Or. Mar. 11, 2014); *see also Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) (ALJ need not accept a medical opinion that includes "no specific assessment of [the claimant's] functional capacity" during the relevant time period); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (ALJ can disregard a medical report that does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity").

Further, the fact that the state agency consulting sources proffered their opinions prior to the onset of plaintiff's knee symptoms does not constitute reversible error. *See Ashley W. v. Comm'r of Soc. Sec.*, 2024 WL 2722895 (D. Or. May 28, 2024) ("the fact that the state agency

Page 6 – OPINION AND ORDER

consulting sources did not consider records beyond December 2017 (i.e., the date of their review) 'is not an error'") (quoting *Sportsman v. Colvin*, 637 Fed.Appx. 992, 995 (9th Cir. 2016)); *see also Jose Z. v. Saul*, 2020 WL 434259, *8 (C.D. Cal. Jan. 28, 2020) ("[c]onsultative examiners, who evaluate a claimant's condition during the initial phases of the benefits application process, will never have all of the evidence available to the ALJ, whose decision is rendered often years later, at which point the claimant will have amassed additional evidence," such that the "value of their opinions" is "not diminish[ed]" where "the examiners reviewed the available evidence predating their opinions, and the ALJ considered other doctors' opinions" and the record as a whole).

In any event, the Court finds the ALJ's decision as it relates to plaintiff's right knee is both based on the proper legal standards and supported by substantial evidence. Notably, an independent review of the record reveals plaintiff did not report any knee pain symptoms until May 2022 and that she failed to seek meaningful follow-up treatment related thereto throughout the remainder of the adjudication period. As the ALJ denoted, the medical records that do exist tend to suggest that plaintiff's reported pain levels were incongruous with her functional abilities.

Specifically, on May 27, 2022, plaintiff complained of "pain and swelling" in both her right and left knees. Tr. 767. Plaintiff was "[n]ot currently taking any medication for the pain." *Id.* She indicated having completed some physical therapy five months ago that did not help. *Id.* At that time, plaintiff also referenced a previous MRI that "showed a torn meniscus in her right knee." *Id.* However, the record before the Court does not contain any physical therapy records or knee imaging. Upon examination, plaintiff was in "no acute distress" and exhibited a "normal gait and station." Tr. 769. She was given naproxen and lidocaine cream for her right knee pain, and was referred "to orthopedics for surgical evaluation." Tr. 769-70.

On June 29, 2022, plaintiff followed up with Dr. Bederka. Tr. 775-77. Plaintiff presented at the clinic "using a wheelchair and reports that at home she walks with a walker." Tr. 776. She reported knee pain lasting approximately six months "which has been progressively worsening." *Id.* Plaintiff nonetheless stated that "she is very active and takes care of her family" and "has been managing her pain with topical creams, a knee massager, ice packs, anti-inflammatory medications, and oxycodone." *Id.* Dr. Bederka's assessment was as follows:

> Her plain radiographs show advanced medial compartment osteoarthritis, grade 3, she reports having had an MRI scan done, however we are unable to obtain any imaging from the site where she reports having had the study done. [Plaintiff] will need to reach out to the site directly and resolve any issues, and return to us with the information of where this was done. She however does report that she was told she had a small meniscus tear, however I am not sure how to treat that based on . . . the report of the MRI scan.
>
> We did discuss that arthritis and meniscus tears could both potentially be sources of her knee pain, however her pain is rather significant today compared to her radiographs. We did discuss that once we have the MRI to review we would need to then formulate a potential treatment plan. Arthroscopic surgery may or may not be an option given the degree of arthritis that she has however given her young age if it has a potential benefit I think that would be reasonable to explore. The alternative option would be knee joint replacement which is recommended treatment for advanced osteoarthritis.

Tr. 775. Plaintiff was again instructed to obtain her MRI results and schedule a telemedicine appointment to "discuss [a further] treatment plan." *Id.* There is no evidence of any additional treatment with Dr. Bederka beyond the initial examination.

The record contains three subsequent complaints of right knee pain, including plaintiff's hearing testimony. On September 27, 2022, plaintiff presented to her primary care provider to "follow up on multiple health concerns." Tr. 757. Namely, plaintiff reported insomnia and bilaterial knee pain, "worse in [right] knee." *Id.* Although no physical examination was administered, plaintiff was noted to be "well appearing" and "in no acute distress." Tr. 758. In concluding the chart note, plaintiff's primary care provider indicated plaintiff had "[c]hronic pain

related to prior knee injury. She also reports diagnosis of sarcoid however upon review of records [that] seems highly unlikely." *Id.* Moreover, although a number of other modalities of treatment were noted to be ineffective and plaintiff requested opiates, her provider declined to prescribe opiates. Tr. 758-59.

On October 11, 2022, plaintiff sought care for widespread chronic pain and again requested opiates. Tr. 752. Upon examination, plaintiff exhibited "[right] knee joint line tenderness; pain with ROM, worse with flexion, varus/valgus movements." Tr. 754. Plaintiff was started on a "SHORT TERM trial of tramadol." *Id.* Plaintiff's provider "[d]iscussed [the] importance of scheduling with ortho in the next 3-6mo, [as] I am not agreeable to long term [prescription] for her with the tramadol." *Id.*

During the December 2022 hearing, plaintiff endorsed generalized pain but did not specifically mention her right or left knee. That is, plaintiff defined her "biggest physical problem" as "pain running down my body constantly like needles" and headaches. Tr. 68-70. Neither plaintiff or her brother testified to knee or joint pain, but they did discuss nerve pain and cramping in plaintiff's arms, hands, and feet. Tr. 70, 79.

On January 31, 2023, plaintiff followed up with her new primary care provider for multiple health conditions. Tr. 802, 810-12. She requested prescriptions for oxycodone ("because her pain is so severe"), gabapentin, and xanax ("to help her sleep as her grandmother recently passed away and she found out that her daughter was molested by someone at her school"). Tr. 804. Plaintiff acknowledged being "seen by orthopedics in the past but felt humiliated by them and wants to see a different provider moving forward." *Id.* Upon examination, plaintiff exhibited "tenderness along joint lines of bilateral knees[,] no effusion[,] no joint laxity." *Id.* Her provider agreed to continue plaintiff's opiate prescription based on her "[h]istory of osteoarthritis" but advised that the

requested dose was "a very high dose [and] twice our initial amount." Tr. 804-05. Therefore, plaintiff was continued on her current dose and once again referred to an orthopedic surgeon.

The results from plaintiff's January 31, 2023, urine test – obtained approximately one week later – showed "positive for methadone, timeline suggestive of use after she was prescribed oxycodone from our clinic." Tr. 796. Plaintiff was repeatedly asked to return to the clinic for another urine sample and a pill count. *Id.* Plaintiff neglected to comply with these requests such that her provider did "not feel comfortable prescribing her any controlled substances moving forward as I have concern for both potential abuse and for sale of the substances." Tr. 795-96. There are no additional medical or treatment records surrounding plaintiff's right knee in the record before the Court.

In sum, the ALJ reasonably concluded that plaintiff could perform a limited range of light exertion work, but with certain non-exertional limitations. While plaintiff proffers a more favorable reading of the medical record, because the ALJ's interpretation was reasonable, it must be upheld. Cf. *Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize evidence as consistent with disability where that evidence "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)); *see also Davis v. Astrue*, 2012 WL 4005553, *9 (D. Or. June 12), *adopted by* 2012 WL 3614310 (D. Or. Aug. 21, 2012) ("it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity, and the ALJ's findings of RFC need not correspond precisely to any physician's findings") (citations and internal quotations omitted).

## CONCLUSION

For the reasons stated above, the Commissioner's decision is AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 19th day of November, 2024.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge